Good morning, Your Honors, and may it please the Court, my name is Evangeline Abriel and I represent Mr. Jumaine Utoliti here. I would like to reserve... Would you mind speaking up just a little? Yes, I would... My name is Evangeline Abriel and I represent Mr. Jumaine Utoliti. I would like to reserve four minutes for rebuttal. All right, thank you for this opportunity to tell you about this young refugee and about the conviction that brings him before this Court. I would like to make three points today, and the first two of those arise from the Board's denial of Mr. Utoliti's motion to reopen, in which they found that he had not established prejudice. Those two points are, first, that Mr. Utoliti did not have a crime involving moral turpitude, and second, that his offense was also not a particularly serious crime that barred him from asylum and withholding. The third point I'd like to make arises from the original proceedings in the case, and that is that Mr. Utoliti established his claim under the Convention Against Torture. I would like to ask the Court, because of these errors, to reverse the Board's decisions and remand to the Board of Immigration Appeals. I'm turning to my first point, that Mr. Utoliti's conviction was not for a crime involving moral turpitude. To be a crime involving moral turpitude, the statute of conviction must require both reprehensible conduct and a culpable mental state. And the statutes to which Mr. Utoliti pled guilty do not meet these requirements. Mr. Utoliti pled guilty to Section 1303A3 of the Arizona Revised Statutes. That requires a knowing touching of another person with intent to injure, insult, or provoke. This de minimis conduct of touching and the de minimis mens rea of knowing with the intent to injure, insult, or provoke does not rise to the level of moral turpitude. How about when it's paired with the aggravator of the deadly weapon? Yes, Your Honor. We do have that aggravating factor of 1204A2, but we can't look at that statute in isolation. Mr. Utoliti did not plead guilty to just that statute, but also to 1203A3. And this Court has emphasized the importance of intent in Altiar. The intent involved in Mr. Utoliti's case of knowing is recognized as a lower mens rea than the intentional requirement that was present in Altiar. I mean, it's fairly similar, right? It's not reckless. It's knowing. Your Honor, the Arizona statutes define knowing quite differently from intentional. Knowing means that the person is aware of the conduct, the nature of the conduct, but there's no requirement that the person be aware of the illegality of the conduct. Intentional isn't defined as actually intending the consequences to occur. Right. But there's two mens rea, right? And then with the intent to do one of three other things. So we do have both. The word intent in that phrase, intent to injure, provoke, or insult, is not really describing a mens rea. What it's doing is really being used as a synonym for the word purpose. So the intent in 1203A3 is knowing. And that's not sufficient under this court's jurisprudence to rise to the level of moral turpitude. Your Honors, I'd like to move on to talk about the particularly serious crime point. And here the Board and the immigration judge made two errors. The first of those was that the immigration judge believed that Mr. Utilegi had an aggravated felony, and he did not, and no one is asserting that he did. It was just a clear error on the immigration judge's part. But it was a really critical error because the aggravated felony is a complete bar to asylum and a very limited restriction on other forms of relief. And the immigration judge knew that. So you want us to look at the facts, basically, under frantic skew. For particularly serious crime, yes, Your Honor. All reliable evidence can be considered in determining whether a particularly serious crime exists. So why wasn't it particularly serious to essentially drive a car towards police officers in the middle of the night? Well, Your Honor, if we look at the record, we can see that, you know, what emerges from looking at what Mr. Utilegi said and what we see in this, in the pre-sentence report is a 19-year-old who got drunk, had had extremely traumatic experiences at the hand of the Uganda police, saw police, and sped up and ran away. Counsel, do we look at the facts, or if we agree with you, just simply remand for the VIA to take another look at it? Yes, Your Honor, that would be the remedy if we ask that you reverse and remand to the Board of Immigration Appeals. Returning to that point. But in terms of the factors, the IJA and the VIA looked at the police report. They looked at the circumstances. And I agree with you that the aggravated felony doesn't count in this context. But how are we to review that? Your Honor, I'm going to do that. Do you think it's enough, or do you think it's clear error in terms of the finding or abuse of discretion? Well, normally this court reviews a particular serious crime determination for abuse of discretion. But where there's an error of law, that is an abuse of discretion. Why is it an error of law? Well, there's no aggravated felony. No, I understand that. But then the VIA went on to analyze the factors and took them all into consideration. So why was that an abuse of discretion? Your Honor, the main reason for that is that the board and the immigration judge relied on an unreliable document. So all reliable evidence can be considered in determining whether there's a particular or serious crime, but it has to be reliable. And the document that was used here isn't reliable for a number of reasons. You're talking about the police report? Your Honor, it's not actually a police report. It's a pre-sentence report. The board referred to it as a police report, but it is a pre-sentence report that purports to summarize a police report. So it's one step removed from the police report. But it also has another, a number of other indicia of unreliability. Why isn't a pre-sentence report reliable? That's what the trial judge used to sentence, right? That's correct, Your Honor. But that was for a different purpose. The trial judge is using those, that pre-sentence report to actually determine what a sentence should be, not whether it's a particular serious crime that would keep someone who has already been declared to be a refugee from the building. But, I mean, doesn't it just lay out the facts? I mean, the facts don't seem to be that disputed here, do they? Your Honor, in you're right. There are some, quite a bit of similarities in the facts. But the fact that the police officer, the pre-sentence report actually says what the police report says, that Mr. Utiliti swerved to hit the police officers, which would indicate more of an intent. That part is denied by Mr. Utiliti's own testimony. So this report, it isn't the actual police report. It's purporting by someone, a third party, to summarize it. That third party's name appears, but there's no signature and there's no attestation of veracity on this as there might be on a police report. So we don't know what errors might have been made, what information might have been excluded if in this pre-sentence report. It also has the ---- aggravated assault on law enforcement. What weight does that have? He pled guilty to Section 13-1204A2. Right. That does not involve law enforcement. You know, for purposes of the particular serious crime, we can look at the evidence. But he didn't actually plead to that. What he pled to was the intentional ---- what he pled to was knowingly ---- Hutching. I beg your pardon, Your Honor? Hutching. Yes, he pled guilty to knowingly touching with a deadly weapon or a dangerous instrument, attempted touching. But on this ---- and he, Mr. Chairman ---- So he says, he says, I was intoxicated and scared and I was afraid of police officers, and the police officers say he tried to hit me. Your Honor, we don't know that the police officer said that. We know that the pre-sentence report says that. Says that, yeah. But the two police officers themselves declined to give statements. So we don't have anything in that pre-sentence report from the police officers themselves. Counsel, the plea agreement and the sentencing order all categorize the lesser charge that he pled to as being non-dangerous and non-repetitive. Yes, Your Honor. Does that have a legal significance in terms of that conviction under State law, Arizona State law? Yes, Your Honor. I apologize. I'm not sure what the exact significance would be under Arizona law, but for ---- Well, it's a State crime, which is why I'm asking. It's a State crime. I'm assuming non-dangerous. That seems obvious. But it repeatedly has the phrase non-dangerous and non-repetitive for each crime that he charged you, and that's the documents, the plea agreement, the sentencing minutes, the sentencing order. What do we make of that? Your Honor, that's something that the Board of Immigration Appeals and the immigration judge did not note. There's nothing in their decisions that notes this thing about the non-dangerous, non-repetitive. And we argue that that's very important. You know, that was a decision by the State judge that this was a non-dangerous offense, and one of the Franteschi factors is the dangerousness. That's one of the factors under Franteschi. So to not consider the assertion or the designation of non-dangerous and non-repetitive was a failure on the Board to consider these points. The ---- We also can't tell for sure whether the judge's aggregated felony error also infected her decision on withholding of removal. We know that it was a very big part of her decision because she says in her decision that the aggregated felony was a big influence on the Court's decision on eligibility. And because of that, that's another reason why the case should be remanded for clarification of ---- on that particular error. We just don't know how much it infected the rest of the decision. And, Your Honors, if I could turn quickly to the Convention Against Torture claim. Mr. Jaliti established his claim for torture. This is someone who had been ---- experienced extreme torture at the hands of the Uganda police. When he was a young teen, he was arrested and beaten on at least two occasions. And then that escalated into a much more serious incident when he was 14, when he was arrested, detained for four days, beaten, and then sodomized by the Uganda police. And he testifies to the trauma that this inflicted on him, that the worst thing that had happened in his life, the pain that he had never experienced before, couldn't walk the next day, never told anyone else until the immigration judge, and then the judge had to clear the courtroom so that he could reveal this information. So in deciding that this had not ---- that Mr. Jaliti had not established his claim, the board and the immigration judge both erred. They both found that there was past torture, but that it didn't ---- that he had not established a clear probability of future torture. But in doing so, they ---- the judge first makes an inexplicable speculation of fact when she says that the only way Mr. Jaliti would be returned to Uganda was if the Uganda government allowed, permitted him to, and then he would be safe. But there's just nothing in the record to support that assumption on the judge's part. And to the contrary, the country conditions report show that there's continued serious violations of human rights and torture in Uganda and impunity for law enforcement. Is your client still detained? He's still detained, Your Honor. Okay. You wanted to save a little bit of time? I did, Your Honor. Thank you very much. Good morning, Your Honors. Good morning. Rodolfo Saenz for the U.S. Attorney General. Before I get into addressing some of opposing counsel's points, I wanted to just quickly recap what issues are at stake in each petition. In the petition for the underlying removal order, the only issue before the court are the cat denial, the cat deferral denial, and the due process claims that are associated with that. In the more new petition for review of the motion to reopen, we're looking at the two independently dispositive findings, the no ineffective assistance of counsel determination and the no prejudice determination that pertains to  Let me ask you this because I would like to understand more what the government's response is. I'll tell you what my main concern in this case was, and it's with the prejudice determination with regard to ineffective assistance of counsel. And I know this relates to the motion to reopen. In looking at the underlying documents, and I don't think the government disputes this, he did plead to a lesser charge. And I'm looking at the plea agreement, it says it's a non-dangerous, non-repetitive offense under the state criminal code, and that's with regard to both of his charges or the charges that he pled to, right? And my concern is that despite the plea agreement and the sensing to a lesser charge, the BIA looked at the wrong charge. And it seems to me from looking at the BIA's analysis that it was very much an elements-based approach where the BIA really focused on dangerousness. So how do we know that starting at the wrong threshold didn't infect the BIA's determination that this was a particularly serious crime? Sure. I think in answering that question, Your Honor, it's important to point out the standard of review because we're in the motion to reopen context. We're talking about whether there's an abuse of discretion. And even if we weren't, that's the standard that governs when there's a direct appeal of a PSC determination anyway. But in terms of what this Court can review, normally there's not jurisdiction to re-weigh the evidence as to particularly serious crime determinations. In terms of the dangerous ---- No, I understand that. But the problem with me, that I have with it, is that the BIA started with the elements, and they're the wrong elements. So all of the discussion very much focused on the nature of the conviction being dangerous and then trying to match it up to the dangerousness element, which is not in the convictions that he pled to. Yes. And we acknowledge the error. At the ambit factor has to start with the ---- considering the nature of the crime, looking at the elements to do so. And here they've quoted the wrong provision, even though they cited the right provision for the CIMT determination. So our position is that remand would be a foregone conclusion because it's still a crime against a person. We know that crimes that generally are against people tend to be particularly serious. It still involves a deadly weapon and an intent to injure, insult, or provoke. And together that kind of creates a situation where there's potential escalation for violence. And we know that there's also involvement of a police officer based on the subsection 1203, pardon, 1204 subsection F, which confirms that the victim has to be a police officer, although there does not have to be knowledge that the person is a police officer. So aren't you basically asking us to reweigh the evidence to find prejudice? Because you've conceded that the Board erred, and then you're saying it's harmful and basically there's no prejudice because we can look at the facts and reweigh them, which is what you told us we couldn't do. We're not looking at the facts, though, Your Honor. We're just looking at the legal determination of what the elements of the crime are. Are you speaking now about the CIMT or the PSC? This is for the PSC. Yeah. Okay. Non-aggravated felony. I mean, what are we to make of the BIAs? They have a whole paragraph where they talk about the IJA's review of the facts of the crime. I mean, isn't that the analysis they were supposed to undertake here? The BIA is supposed to? Yeah. On the motion to reopen decision, they have a whole paragraph talking about the police report and the judicially noticeable documents and the events that supported this finding. Correct. That's if once we've determined that the offense falls within the ambit of particularly serious, then we look to the underlying facts of the conviction and the sentence.  That analysis of the nature of the crime, though, is mapped onto the BIA's mistaken assumption that the elements included dangerousness, right? And the crimes that he pled to were specifically deemed under state law to be non-dangerous and non-repetitive. I'm not sure what non-repetitive means in that context, but certainly non-dangerous, right? Well, if we're looking at the facts as opposed to the ambit, which is more about what the elements of the offense are, and we let's put aside the issue of reliability of the documents, we know based on the evidence that there was a lot of corroboration in the account, namely that there was drunk driving involved, speeding, that there was a passenger in the car, that a high-speed chase ensued afterwards. This is all corroborated by Mr. Udaliti's own testimony. So if we're looking at those facts together with this state determination of non-dangerousness, I think there's a lot of things that weigh against that. And then we know, even as to the disputed fact in terms of reliability, that his own testimony, I'm sorry, the plea agreement transcript says that he had factual, that he, sorry, that the factual allegations were that he attempted to touch a police officer with his vehicle. And we also know from the elements of the offense that he had to have done that as well. So looking at the weight of the evidence, putting aside reliability, there's still enough in the evidence in the record to determine that there is, that the nature of the crime is serious. So why don't you turn to the crime of moral turpitude findings? Sure. For the CIMT determination, we know that there are two mens rea that are involved, which either independently or together are sufficiently culpable. We know that based on Board and Ninth Circuit precedent that even recklessness is sufficient. Here we have the knowing that you touched the victim and then the intent to injure, insult, and provoke. Those two together are sufficient to pass the bar. And then we have the aggravated felony of the use of the deadly or dangerous weapon, which this Court analyzed in Altayar and determined that that either involves some sort of instrument that is designed for death or serious bodily injury or, based on the circumstances, is capable of having that sort of an effect. That alone is enough for this Court to conclude that it is a CIMT. In terms of Mr. Udaliti's approach to the CIMT analysis, it's contrary to the categorical approach in that we know from Mathis and its progeny that we consider all the elements together when looking at the statutes of conviction versus the generic offense. And we also know that it's contrary to this Court's CIMT case law, which looks at assault offenses with a sliding scale and inherently looking to see whether some elements of an offense make up for other elements of an offense. What about the reference to insult? I mean, that's the one piece of this that probably seems the least turpitudinous, if you will. Sure. Because it's one thing to injure someone or provoke somebody, but it's another thing to just insult them. And I think there, Your Honor, it's important to highlight that that insult doesn't happen in a vacuum. It happens in the context of use of a deadly weapon. And so even when you're insulting someone with a deadly weapon — How do you do that? How do you insult somebody with a deadly weapon? Well, you commit the assault with the deadly weapon, but you have the intent to insult them. So built into this crime is sort of a recognition that certain actions are going to lead to escalating harm. With the deadly weapon and with the intent even to insult, you're creating a dangerous situation. And that's why we argue that, similar to Altair, there is this necessary inherent risk of danger associated with this crime. If, hypothetically, we disagreed with you on CMIT, what does that do to removability? Let me explain. You didn't charge particularly serious offense in removability. You only charged CMIT. Right. So if, hypothetically, we disagreed with you and said there's not enough here for CMIT, what does that do? Aren't you limited to the — I guess, to be direct, aren't you limited to the removability issue that you charged? Correct, Your Honor. So if CMIT is off the table, then he's not removable. And particularly serious is an add-on to removability, but you have to be removable in the first instance. Would you agree with that? So because there's only one removability ground, then there's nothing else in terms of removability. But our position is that you don't even need to get there because we have the added aggravated factor of a police officer, which we know, based on this Court's precedent, is enough to add to the seriousness, the reprehensibility of the crime.  I'm just trying to make sure that my analysis is correct in terms of what's on the table. So I get your argument. Was he charged with a police officer aggravator? So it's a little bit tough to follow, but the plea agreements all say aggravated assault with a deadly weapon involving a police officer. His plea agreement transcript has facts and also lists that charge against the police officer. He admits those facts that it involves a police officer. The disposition and the sentencing documents, however, omit this. But based on the fact that we, looking at subsection 1204F, that we know that this has to have been a Class II felony in order to ultimately get the Class III felony designation that was assigned at the conviction level. And that's because any attempt basically raises the Class felony designation up one level. And based on our review of the statute, the only way that you could get a Class III felony, and therefore a Class II initially before the attempt, is by having this added element of a victim. Do you understand the BIA and IJ to be conceiving of the offense in that way, or just simply with the dangerous weapon aggravator? The Board did quote from the plea agreement and does acknowledge language of with a police officer in its decision before it gets to the Altaïr discussion. But it ultimately, in terms of its reasoning, just relied on the elements without the police officer offense. I'll just quickly jump back to CAT. In looking at the CAT deferral determination, we and the agency acknowledge that there was past torture in this case. Mr. Udaliti, in the reply brief, concedes that there's no presumption of future torture as a result. And that makes sense in light of this circuit's precedent. Basically, there needs to be some sort of continuing risk. Sorry to interrupt. Can I have you go back to the plea agreement? You're saying the plea agreement referenced the police officer. And are you talking about the part on page 3 of the plea agreement where it says defendant shall not initiate contact with the victim officer, or you're looking at something else? So Your Honor's talking about the plea agreement itself, right? Right. Both the plea agreement and the change of plea agreement, those are at one minute, Your Honor. Well, the change of plea is at 884. That references the police officer, and so does the other. No, I'm looking at the plea agreement, and you're saying the plea agreement specifically referenced the officer. I do see that it says defendant shall not initiate contact with the victim officer. Yes. Is that what you're referring to? No. I was actually referring to when it identifies the offense itself in Count 1. I believe it says aggravated assault on law enforcement. That's what I was referring to. If there are no further questions on the CIMT or PSC determinations, I'll just wrap up with Kat. So I mentioned that there is no presumption of future torture, and we know, based on this Court's case law, that there has to be evidence of sort of continuing risk of that torture occurring. Cases like Sopansi Salazar and Xochitl Jimenez sort of get to this point that there needs to be additional evidence of the same harm occurring. Here we have no evidence of refugees being targeted for harm. The worst that we have in the Department of State record is that they are discriminated against. And even putting that aside, there is a divide between his claim of future torture, which is what he testified was the basis for his claim, and his past torture. So he alleged that he was fearing that he would be at the airport and that there would be an interest in extorting him due to his origins in the U.S. That's definitely far from what his past torture was, and there is no evidence, as the agency determined, of particularized risk. In fact, the State Department reports just focus on the targeting of political dissidents and journalists who oppose the government. So our position would be that substantial evidence supports that determination. Thank you, counsel. Thank you. I'd like to address three points on rebuttal, Your Honors. The first is the opposing counsel's reference to the police. Neither the Board of Immigration Appeals nor the immigration judge commented at all on the fact that there was a police officer involved in this. They might have stated it in facts, but they did not refer to it as something that they considered in determining that this was morally too pertubuous or particularly serious. And to the — Well, I mean, to be fair, the BIA decision on page 5, ER7, does talk about the nature of the offense, high rate of speed, defendant responded, turned his vehicle toward them, causing them to jump out of the way. So they did discuss the facts as relayed in the police report or the pre-sentence report. But my issue is that that discussion of the nature of the offense really maps onto what they thought were the elements, which includes dangerousness. And that allegation was specifically dismissed as part of the plea agreement, the dangerousness allegation. Yes, Your Honor. We are definitely in agreement with you on that point. But in terms of what you just described, the board discussing, they didn't highlight that these were police officers as opposed to someone else. In other words, they didn't use the identity of the victims as any kind of — in their determination of moral turpitude or particularly serious crime. And we can't — but more importantly, we're using the categorical approach for the crime involving moral turpitude. And the elements that Mr. Utility pled guilty to in 13-1202 were the aggravating factor of deadly weapon or dangerous instrumentality, not police officer. There are — there is a separate aggravating factor under 1204-88 of having the victim be a peace officer, but that's not what Mr. Utility was charged with, nor what he pled to. And the — what Mr. Utility was charged with, the provisions that my friend is referring to occur in the sentencing provisions. You know, we can't — the sentencing provisions are not part of the elements that we look at in determining whether we have a crime involving moral turpitude or not. And the sort of determination of how this became a Class III felony versus a Class II felony is really just speculation on our part. There's no indication of the record of how that — how that happened. So you're saying having police officers as victims is a specific aggravator that has to be charged? Yes, Your Honor. There are sentencing provisions that change the sentence if there's a police — peace officer involved, but that's not an element that we look at in the categorical approach for purposes of determining whether there's a crime involving moral turpitude. All right. You're actually getting over time, so you can go ahead and wrap up. My last point was just to emphasize that past torture is the most important element, most important factor in — looked at in determining whether someone has — has established the claim for — for — under the Convention Against Torture. So thank you very much, Your Honors. We ask that you reverse and remand. Thank you. All right. Thank you very much to both sides for your very helpful argument this morning, and thank you in particular for participating in our pro bono program and taking this case. It's very helpful to the court. The matter is submitted.
judges: THOMAS, NGUYEN, BRESS